## CONDUCT OF AN ATTORNEY WARRANTING SUSPENSION FROM THE PRACTICE.

Circuit Court of Cuyahoga County.

IN RE DISBARMENT PROCEEDINGS AGAINST HORACE NEFF, ATTORNEY AT LAW.

Decided, 1912.

*Attorneys—Unprofessional Conduct in Interfering with Administration of Justice.*

Where an attorney approves of and aids in the execution of a plan to discredit a juror and the prosecutor in a criminal case then on trial, by creating a false situation by causing the juryman, by means of a pretended message from the prosecutor, to visit the prosecutor's home at midnight, such attorney is guilty of unprofessional conduct, in interfering with the proper administration of justice, and such misconduct is not excused by an honest belief that the prosecutor had an unfair advantage in criminal trials which the attorney was seeking to expose.

KINKADE, J.; WILDMAN, J., and RICHARDS, J., concur (sitting in place of judges of the eighth circuit).

This is a disbarment proceeding commenced in this court against Horace Neff, a member of the Cleveland bar. The alleged misconduct which the committee insists justifies his disbarment occurred in connection with a criminal trial in the common pleas court in Cleveland in December, 1911, before Honorable W. A. Babcock, Common Pleas Judge.

The prosecution which involved a felony was one against J. A. C. Golner, who is now serving sentence imposed in that case.

Golner was represented in his trial in court by two members of the Cuyahoga Bar who were men of ability and unquestioned integrity, and who were fully qualified to protect the interests of their client in every respect. The trial was commenced on Monday and lasted until the next succeeding Monday, in the evening of which last mentioned day a verdict of guilty was returned by the jury. About the time the trial was begun or very soon thereafter, the accused, Golner, employed the respondent, Horace Neff, as additional counsel in his behalf. The scope of Neff's employment is not very clearly shown by the evidence. Neff's statement in respect to it is that he was employed by Golner for the purpose of aiding in securing as low a sentence as possible, if Golner should be convicted. Neff was to have nothing at all to do with the trial of the case in court. His employment was rather unusual, to say the least. About the time that Neff was employed, Golner determined that it was necessary, in order to properly safeguard his interest, to employ a detective agency to operate in his behalf. He was aware that for some time prior to that the county had employed a detective regularly to work in connection with the prosecutor in criminal trials, and Golner, it seems, decided that his interests needed a like supervision during the trial. It does not appear that Neff had anything to do with the employment of the detective. On the Sunday night, the day preceding the Monday on which the case was finished, the chief of the detective agency, a Mr. Woodward, sent a messenger by the name of Noonan, who was well acquainted and had been for many years with the respondent Neff, to the Neff residence to say to him that he was wanted at the office of the detective agency forthwith to give advice concerning an important matter. Noonan represented to Neff that he did not know what the matter under consideration was. Neff went with Noonan to the detective agency's office and on arrival he found there, Woodward, the man on trial, Golner, a brother of Golner and perhaps one or two others. The chief detective Woodward then explained to Neff that his agency had been retained by Golner some days prior, and that they had been keeping close watch of the parties connected with the trial, and particularly of the movements of the county detectives and the jurors sitting in the case, and that

his men had reported to him a situation that led him to believe
that Golner was not having a fair trial but was being railroaded,
regardless of the evidence, to a conviction.   He stated it to be a
fact that a number of the regular jurors, sitting in criminal
cases in Cleveland, were employed by the prosecutor as spies to
take note of how jurors voted in various cases, whether for ac-
quittal or conviction, and to report the facts to the prosecutor
in order that with this information in hand, he might excuse on
challenge for cause and peremptorily challenge jurors who were
known to have voted for acquittal in different cases, to the end
that he might secure on each trial jury as many as possible of the
jurors who were strongly inclined to vote for conviction in crimi-
nal cases, and it was there stated by Woodward that this practice
was very general on the part of the prosecutor's department,
and through this means, aided by an unwarranted interference
with witnesses and perhaps some intimidation of jurors by the
county detective, one Doran, the prosecuting attorney was given
a very unfair advantage against all defendants in criminal trials,
and in connection with this general statement, it was stated to
Neff that one of the jurors in the Golner case, a Mr. Glass, was
one of the regular spies of the prosecutor's department, and a
very unfair man to sit in that case.   In fact, the jury as a whole
was said to have been unfairly selected and hence his anticipa-
tion of Golner's conviction which I have stated.   Woodward out-
lined to Neff that after getting this information he had evolved
a plan which he thought would aid Golner and this was his
plan:   He proposed to send Noonan, alone in an automobile, to
the residence of Glass that night, to say to Mr. Glass that the
prosecuting attorney had sent for him, and would like to have
him come to his house, and if he consented to go, Noonan was to
take him in the automobile to the prosecutor's residence, and
there leave him.   In the meantime, another automobile was to
take several witnesses to a point near the residence of the prose-
cutor, and there await the coming of the juror with Noonan,
in order that they might see the juror making a midnight visit
to the prosecutor's house, all of which it was claimed, when made
known, would disclose that the juror was under the complete
dominion and control of the prosecutor, and consequently not

a. proper man to sit in the trial against Golner.   At this point, Neff was informed by Woodward that his advice was desired as to whether the proposed scheme was illegal, and was told that they had sent for him for that purpose.   Neff says that he informed Woodward and his associates there assembled including Golner, that he knew of no statute that would be violated in executing the plan contemplated.   That he said to them if they believed a juror to be thus biased and subject to the call at any time of the prosecutor, notwithstanding the instructions to the jury given daily by the trial judge, that Woodward and his associates had a legal right to test out whether that was a fact or not, and that they might do so without violating the law, under the plan outlined.   Neff says that he inquired how it was to be made beneficial to Golner in a practical way, and that some one of the party suggested something about a new trial, but that he promptly informed them that taking a juror to the prosecutor's home and leaving him there as they planned would not be sufficient to bring about a new trial, and that Woodward then remarked that they would have something in addition to this trip of the juror.   Neff says he preferred to return home but that the others insisted that he should remain and go with them to procure the witnesses and accompany the party of inspection on its trip to the prosecutor's.house, and that he reluctantly acquiesced. Noonan was despatched in an automobile for Glass.   Golner's brother, acting as chauffeur, took another automobile with Neff and picked up three or four other witnesses and went to a point near the prosecutor's house from which they could see the movements of Noonan and Glass at the proper time.   It was definitely understood that nothing was to be said to Glass about why the prosecutor wanted him.   Noonan was to state and did state to the juror that he did not know what Glass was wanted for by the prosecutor.   All agreed that Golner's trial was not to be mentioned by Noonan or any one else to Glass and this was carried out as planned.   As soon as Noonan arrived at the residence of the prosecutor, which was several miles from the home of the juror Glass, Mr. Glass alighted from the automobile and went up on the porch of the prosecutor's residence and rang the door bell.   As soon as the prosecutor came to the door, Noonan left

in his automobile and the prosecutor called to him, as he left, to halt, which he did not heed, but returned to the city followed by the other automobile.  Mr. Glass learned in a few moments from the prosecutor that he had not been sent for at all, and he took the street car and went home.  No report of this occurrence was made by anybody connected with it in behalf of Golner to the trial judge until after Golner's trial was over, but the trial judge learned of the occurrence shortly after midnight and very soon after the visit of Glass to the prosecutor's residence.  This information came to the trial judge through the county detective, Doran, who probably learned of it through the prosecuting attorney.  Mr. Neff insists that he called at Judge Babcock's court room four times on Monday for the purpose of telling him of the occurrence, but each time found him busy, and went away without reporting it.  On Monday evening the jury returned a verdict of guilty and immediately upon the coming in of the verdict, Golner had a whispered conversation with one of his counsel who immediately stepped to the bench and informed the trial judge what had taken place in connection with the visit of juror Glass to the prosecutor's residence at midnight the night before, and was then informed by the trial judge that he, the judge, knew of it soon after it occurred, and that it was on that account that he had not permitted the jury to separate on Monday.  By Tuesday morning the whole matter had become public and it was stated in the newspapers.  It is said, however, that Mr. Neff's name was not published as one connected with the transaction.  On that day, Mr. Neff called upon the trial judge and expressed a desire to state all the facts in connection with the transaction, but was told by Judge Babcock that he understood contempt proceedings were to be instituted against several of the parties involved, and that on that account he preferred not to hear his statement until the contempt cases should be called for hearing.  Proceedings in contempt were begun against four of the parties involved (not including Neff) and those cases were heard before Judge Babcock and resulted in a conviction in each case and sentence.  Mr. Neff voluntarily testified at the contempt trials.  Error proceedings were prosecuted

from this judgment in the contempt proceeding and judgment was affirmed by the circuit court.*

No proceeding in contempt was instituted against the respondent but the Bar Association of Cleveland made an investigation of the facts and a recommendation to the circuit court that a committee be appointed to investigate and file charges, if the investigation so justified. The committee herein named was appointed pursuant to this motion in the circuit court and presented herein formal charges covering the facts I have detailed. The committee insists that the plan as carried out was intended to interfere with the administration of justice, and that it was undoubtedly the purpose of all concerned to rely upon it, at least in a substantial part, in making a showing for new trial for Golner, and while it is not claimed that Neff was instrumental in the employing of the detective agency by Golner, or that he originated the plan of procedure carried into effect on Sunday night, that still the scheme was his by adoption and that he must be held fully responsible for it, and that his action was such misconduct in office as justifies his disbarment.

On the other hand, counsel for respondent contend that the action of Neff was entirely laudable and that he was merely seeking to expose, in order that he might correct, a long continued line of unfair conduct on the part of the prosecuting attorney's department.

Upon this hearing the committee offered in evidence a transcript of the evidence taken in the contempt case, in so far as it should be found by us to be competent, and also called and examined orally the trial judge, Honorable W. A. Babcock. The respondent testified in his own behalf.

We have been furnished with a transcript of the oral evidence of the trial judge and Mr. Neff and have read this in connection with the transcript of the contempt case.

We think it is well established by the evidence presented that Mr. Neff thoroughly believed, when counselled with concerning this detective's plan on Sunday night, that there then existed

---

*See 19 C.C.(N.S.), 317.

and had for a long time existed in Cleveland such conditions as gave to the prosecuting attorney an unfair advantage in the trial of criminal cases. We express no opinion as to whether any such unfair advantage did exist, because we have not heard the evidence concerning this question on the side of the prosecuting attorney, but we think it entirely clear from the testimony of Mr. Neff, the testimony of Judge Babcock and the other evidence presented to us, that Mr. Neff believed at that time that such unfair conditions did exist.

It is possible that Mr. Golner, his brother and the detectives, may have thought that this midnight visit of the juror would be entirely sufficient, standing alone, to secure him a new trial if convicted, notwithstanding what Neff says he said to them on that subject, but it is difficult to see how any lawyer could reach any such conclusion, for to do so he must necessarily assume that both the prosecutor, who was a man of experience, and the trial judge, who had been many years on the bench, could be easily imposed upon by evidence which would readily be explained so that it would have no value in securing the end designed by it. It is possible that the detective may have thought that affidavits from these witnesses that were taken to the scene would pass for their full face value, with the prosecutor and judge, without further investigation, but it must be borne in mind that these witnesses were all residents of Cleveland, easily accessible, and of course they would be called upon within a few hours, after the filing of their affidavits, by the county detective under the direction of the prosecutor and the whole matter would receive a thorough investigation. It was explained at the detective's office that what he desired in the way of witnesses was to have three or four men of high standing, in no wise connected with Golner and not connected at all with his office, in order that when their testimony was taken, it should have great weight, and it was agreed that they were not to be told anything of the plan more than to say to them that it was desired that they should take a certain position from which they might see a juror visit the prosecutor's house at midnight; the theory being undoubtedly that that single fact would be all that would be included in their affidavit, it is should be filed in aid of a new trial, and that

this fact would exactly tally with the truth. The detective emphasized the fact that he desired honorable men of high standing for witnesses, and while Neff and Golner's brother accompanied them, the plan did not contemplate taking their evidence in establishing the fact of the juror's visit. Those witnesses were selected by Golner, his brother and Neff. It is entirely clear that as soon as any one attempted to make use of the affidavits of these three or four honorable witnesses, the trial judge would insist upon knowing all the facts, and these witnesses, being honorable men, would of course not hesitate to state the facts as to who selected them, from what point they started, who accompanied them, how they went and how they returned, and all about it; and this would increase the list of honorable witnesses by two because it would immediately add Mr. Neff and Mr. Golner's brother, and then it would develop, of course, that the visit of the juror was planned by the very men who were seeking to take advantage of it, as a piece of wrong-doing, to secure a new trial for Golner, and at about this point it might be expected that the motion for a new trial would be promptly overruled, and contempt proceedings ordered, very much as happened in this case. The whole scheme was silly in the extreme. It was wholly unnecessary to send for Mr. Neff or any other lawyer to secure advice concerning it. Had its authors called in some passing laborer, whose mind had not been perverted by long continued study of the best methods of accomplishing recognized impossibilities, no doubt he would have readily applied his common sense to the situation and branded the scheme as nonsense. It was Mr. Neff's duty to have condemned the whole plan forthwith. This was not a case where a juror had been nibbling for a bribe. So far as the evidence discloses nothing irregular had occurred in the Golner trial. It is true that a vigorous effort was made by Golner's counsel to prevent Glass from sitting as a juror, but after the fullest examination he was accepted as qualified by the trial judge, and the evidence does not disclose any misconduct on the part of any juror during the trial of this case prior to this Sunday night. Even though the respondent-Neff honestly believed the information which he says he did at that time as to unfair advantage being taken by the

prosecutor's department, and even though it be conceded ·that his sole purpose was to expose this, we can not at all sanction the methods by which he undertook to aid in correcting this alleged wrong. In fact, we think his own evidence discloses that before the left the detective's office, he had reached the conclusion himself that the proceeding was an improper one. His reluctance to go with the party which he tells of, and his haste to get away from the scene near the prosecutor's house, as he relates it, shows clearly that he was convinced of the impropriety of the entire matter.

We note a discrepancy in the testimony of Mr. Neff before us as compared with his statements made in the contempt case. In the contempt case the transcript of his evidence shows that he went to the same point that all the other witnesses went and went in an automobile with them to that place near the prosecutor's house, and that he remained there in that automobile until Noonan left his position and started down town, passing this automobile, when Neff alighted from his conveyance and got into Noonan's machine. In his evidence before us, Mr. Neff testified that he went only part way to the prosecutor's house and then alighted with a view of taking a car near there for his home, which he would have done but for the fact that while waiting for the car, Noonan came along in his automobile and picked him up. According to Mr. Neff's own evidence, he approved and aided in the execution of a plan which tended to discredit a juror and a public prosecutor, by creating a false situation that would never otherwise have existed. We are not satisfied that he made all the effort he should have made to communicate all the facts to Judge Babcock on Monday, knowing the hours of court and being as thoroughly acquainted with the judge as he was. Mr. Neff is thirty-three years of age and had been in more or less active practice of the law in Cleveland for several years prior to the Golner trial. The committee insists that he was abundantly qualified to appreciate in every respect the whole plan laid before him by the detective and to see at a glance its effect upon the administration of justice, and that no account can be taken of his inexperience which can in any way relieve him from the full measure of responsibility for what was done. If

we consider Mr. Neff as possessing the ability which the committee says he does, we must at once acquit him of the charge that he intended to use this midnight visit of the juror to the prosecutor's residence to secure a new trial for his client Golner. Exposure was inevitable, for the reasons I have stated, and when that came he would have accomplished the very opposite of what he was employed to accomplish for his client, by putting his client before the trial judge in the very worst possible light. The trick would not only have convinced the trial judge that the jury was unquestionably correct in finding Golner guilty but it would have presented Golner as willing and ready to carry out a scheme, the purpose of which was to impose upon the trial judge. No one pretends that Neff knew anything of the scheme until he arrived at the detective's office where he insists he was called upon suddenly for a decision as to its legality in order that the parties might go ahead with its execution. It is a significant fact in favor of Mr. Neff that no proceeding in contempt on account of this matter was ever begun against him.

Our conclusion, after the fullest consideration of all the facts in the case, is that the situation does not justify a judgment of disbarment, but we are unanimously of the opinion that the evidence does justify a suspension of the respondent, Horace Neff, from practice for a period of six months, and such will be the judgment of the court.